# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANTOINETTE BURNS,<br>  Plaintiff<br><br>  v.<br><br>GEORGETOWN UNIVERSITY<br>MEDICAL CENTER, *et al.*,<br>  Defendants | Civil Action No. 13-898 (CKK) |

## MEMORANDUM OPINION
(August 12, 2016)

This case is about a medical fellowship gone awry. As a result of the events described below, Plaintiff Lieutenant Colonel Antoinette Burns—the participant in the fellowship—brings contract-based claims against Defendants Georgetown University Medical Center ("Georgetown" or "GUMC") and against MedStar Georgetown University Hospital ("the Hospital") (Counts I, II, and III).[1] Burns also brings three tort claims arising out of the events described below: a negligent defamation claim against the Hospital and against Dr. Matthew Levy (Count IV); an intentional defamation claim against Levy (Count V); and a claim for intentional interference with prospective economic advantage against Levy (Count VI). Defendants move for summary judgment on all of the claims in this case.

Specifically, before the Court are Defendant MedStar Georgetown University Hospital's [62] Motion for Summary Judgment as to Counts I, II, and III; Defendant Georgetown University Medical Center's [63] Motion for Summary Judgment as to Counts I, II, and III; and

---

[1] The formal names of the institutional defendants are Georgetown University, doing business as Georgetown University Medical Center, and MedStar-Georgetown Medical Center, Inc., doing business as MedStar Georgetown University Hospital. The former refers to Georgetown's medical school; the latter refers to the hospital, which is—and has been at all times relevant to this case—a separate legal entity from the University.

Defendant MedStar Georgetown University Hospital's and Defendant Matthew Levy, M.D.'s [64] Joint Motion for Summary Judgment as to Counts IV, V, and VI. In addition, before the Court are Defendants' [65] Motion *In Limine* to Preclude Plaintiff's Use at Trial of Evidence Inadmissible under the District of Columbia Peer Review Statute and Plaintiff's [69] Motion *In Limine* to Exclude Evidence of Settlement Discussions. Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS each of the three pending motions for summary judgment. Defendants, collectively, raise a host of arguments as to why none of the claims in this case survive summary judgment; the Court outlines and addresses those arguments below. In short, however, the Court concludes that Defendants prevail on each of the respective motions for summary judgment, and the Court grants summary judgment to Defendants on all claims in this case. With respect to the dueling motions *in limine*, the Court need not resolve them in order to resolve the three pending motions for summary judgment. Accordingly, the Court DENIES AS MOOT the two motions *in limine*. The Court dismisses this case in its entirety.

---

[2] The Court's consideration has focused on the following documents:

- Def. MedStar Georgetown University Hospital's Motion for Summary Judgment as to Counts I, II, and III  ("Def.'s Mot."), ECF No. 62; Def. MedStar's Reply in Support Thereof, ECF No. 73;
- Def. GUMC's Mot. for Summary Judgment as to Counts I, II, and III ("Def. GUMC's Mot."), ECF No. 63; Def. GUMC's Reply in Support Thereof, ECF No. 74;
- Def. MedStar Georgetown University Hospital's and Defendant Matthew Levy, M.D.'s Joint Motion for Summary Judgment as to Counts IV, V, and VI, ECF No. 64; Defs.' Reply in Support Thereof, ECF No. 75; and
- Pl.'s Combined Opp'n to Defs.' Motions for Summary Judgment ("Pl.'s Opp'n), ECF No. 71.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND

The Court presents here the minimal background necessary to set the stage for the discussion of the issues raised in the pending motions. Specifically, the Court focuses here on the establishment of Plaintiff's fellowship, including the several agreements that set the parameters for that fellowship, as well as the events that led to the early termination of the fellowship.

## A.  The Fellowship Begins

Prior to the events that underlie this case, Plaintiff was trained as a physician and served as a pediatrician in the United States Air Force. *See* Pl.'s Counter-Statement of Undisputed Material Facts, ECF No. 71-1 ("Pl.'s Counter-Stmt."), ¶¶ 8-12. In January 2011, Plaintiff was informed that she had been selected by the Armed Services' Joint Graduate Medical Education Selection Board for additional civilian sponsored training in pediatrics, including a master's degree in public health, for a period between August 1, 2011, and July 31, 2013. *See* Pl.'s Opp'n, Ex. 19 (Selection Letter); *id.*, Ex. 11 ("Grau Test."), at 19:10-20:22 (clarifying that date was January 2011). Plaintiff was to remain on active duty during the period of training under the command of the Air Force Institute of Technology. Selection Letter at 1. Plaintiff was prohibited from receiving a salary or stipend from the training institution. *Id.* After evaluating multiple opportunities, Plaintiff was accepted and chose to attend the program at Georgetown. Pl.'s Counter-Stmt. at ¶¶ 31, 34.

Before the fellowship could commence, several agreements were signed—agreements that are at the heart of this case. The Court reviews the agreement between the Air Force and Georgetown University Medical Center, followed by the agreement between Plaintiff and Georgetown University Medical Center, as well as several related agreements.

Georgetown University Medical Center and the United States Air Force entered into a "Medical Residency/Fellowship Agreement" regarding Plaintiff's training. *See* Def.'s Mot., Ex. G at 2-3; Pl.'s Opp'n, Ex. 22 at 2-3 ("Medical Residency/Fellowship Agreement"). David Rubenstein, Vice President for Financial Planning and Analysis, signed the agreement on behalf of Georgetown University Medical Center on June 8, 2011; the next day, June 9, 2011, Lieutenant Colonel Debra Miesle signed the agreement on behalf of the United States, specifically on behalf of the Air Force Institute of Technology.[3] *See id.* There were no other signatories to the agreement. The agreement appears to be based on a form agreement, with information specific to Plaintiff's fellowship filled in as necessary. *See id.*; Pl.'s Opp'n, Ex. 21 (e-mail stating that the 2011 template should be used for the Medical Residency/Fellowship Agreement). The agreement begins with the following provision:

> 1. It is understood that <u>Antoinette Theodora Burns</u> will take residency/fellowship training at <u>Georgetown University Post Doctoral Fellowship in Community Pediatrics w/MPH</u> concurrently with his/her official Air Force duties from <u>1 August 2011</u> to <u>31 July 2013</u>.

Medical Residency/Fellowship Agreement at 2.[4] The agreement includes other provisions regarding remuneration of Plaintiff, insurance, liability, and the termination of this agreement. *See id.* at 2-3. Further explanation of these provisions is reserved for the discussion of the issues below. This agreement was accompanied by a one-page "Memorandum for Training Institution" from Lieutenant Colonel Miesle, the Chief of the Healthcare Education Division of the Air Force Institute of Technology, who also signed the Medical Residency/Fellowship Agreement. *Id.* at 1.

---

[3] There is no difference between the versions of the Medical Residency/Fellowship Agreement attached to Defendants' briefing and to Plaintiff's briefing, except that only the version attached by Defendants includes the signature on behalf of the Air Force.

[4] Beneath the underlined information in this excerpt—such as Plaintiff's name—the agreement specifies the type of information to be completed in each "blank," such as "First name, MI, Last Name" and "Name of Training Institution."

That Memorandum stated that "[w]e understand that an Air Force military officer, named in the attached agreement has been accepted for residency/fellowship training by your institution for periods indicated in the attached agreement." *Id.* The Memorandum further stated that "[t]he Air Force officer will not be able to start training at your institution until both your institution and the Air Force sign this agreement." *Id.*

Through a letter dated August 1, 2011, on letterhead of Georgetown University Medical Center and addressed to Plaintiff by name, Plaintiff was offered "a non-paid Post-doctoral Research Fellowship appointment in the Department of Pediatrics at the Georgetown University Medical Center, effective August 1, 2011." Pl.'s Opp'n, Ex. 25 ("GUMC Offer Letter"), at 1. The letter explained that Plaintiff was offered the fellowship position "pursuant to a Medical Residence/Fellowship Agreement between the U.S. Air Force and Georgetown." *Id.* That document was accompanied by the GUMC Research Fellowship Agreement and the GUMC Research Fellowship Policy. *Id.* at 1-2. The offer letter further stated as follows:

> If the terms specified in the letter and the accompanying Post-doctoral Research Fellowship Agreement are acceptable and you have read and agree to be bound by these terms and the policies referred to herein by reference, please sign this letter and the enclosed agreement and return both to me within fifteen (15) days of the date of receipt of this letter.

*Id.* at 2. The letter was signed by David B. Nelson, identified as Professor and Chair; in addition, the letterhead identifies Nelson as affiliated with Georgetown University Children's Medical Center. *Id.* at 1-2. Plaintiff signed the letter, underneath text indicating that she was accepting the offer as set out in the letter, and dated it August 25, 2011. *Id.* at 2.

An additional agreement between Plaintiff and the Georgetown University Medical Center, the "Research Fellowship Agreement: Georgetown University Medical Center," referenced in the offer letter, sets out obligations of the Research Fellow (Plaintiff) and of Georgetown University Medical Center. Def.'s Mot., Ex. I ("Research Fellowship Agreement"),

at 1-4. The Research Fellowship Agreement was signed by Plaintiff and dated August 25, 2011, under the heading "for the Postdoctoral Fellow." *Id.* at 4. For Georgetown University Medical Center, the agreement was signed by a faculty supervisor (dated August 24, 2011), by the department chair, Nelson (dated August 24, 2011), and by the senior associate dean for faculty and academic affairs (dated September 15, 2011).

The record also includes a copy of a single page of an offer letter pertaining to the same position, with almost identical text, on letterhead of MedStar Georgetown University Hospital and dated June 2, 2011. Pl.'s Opp'n, Ex. 25. The letter does not include a signature page, and there is no indication whether the letter was sent to Plaintiff or signed by any of the parties. *Id.* The record does indicate, however, that multiple versions of the offer letter were exchanged between the parties during the summer of 2011. *See* Pl.'s Opp'n, Ex. 21, at MedStar-00000026. Like the offer letter on the Georgetown University Medical Center letterhead, the letter stated that Plaintiff was being offered a "full-time Post-doctoral Research Fellowship appointment in the Department of Pediatrics at the Georgetown University Medical Center." *Id.*, Ex. 25, at 1.[5]

In addition to the agreements described above, the two institutional defendants in this case—Georgetown University Medical Center and MedStar Georgetown University Hospital— entered into a letter agreement regarding their respective responsibilities in connection with Plaintiff's role as a Post-Doctoral Fellow in Community Pediatrics and Child Advocacy. Pl.'s Opp'n, Ex. 55, at 1. That letter was dated August 1, 2011. *Id.* On behalf of Georgetown

---

[5] The June 2, 2011, letter states that the appointment would be effective July 1, 2011, whereas the August 1, 2011, letter states that it would be effective on August 1, 2011; but both letters state that the term of the position is to begin on August 1, 2011. *Compare* Pl.'s Opp'n, Ex. 25, at 1 *with id.*, Ex. 26, at 1. The discrepancy in dates suggest that the letter with the later date superseded the earlier one.

University, it was signed by David Rubenstein, Vice President, Financial Planning and Analysis, Georgetown University. *Id.* at 2. On behalf of MedStar Georgetown University Hospital, it was signed by Richard Goldberg, President, and by David Nelson, Chair, Department of Pediatrics.[6] *Id.* at 4. Finally, Plaintiff applied for clinical privileges and then received credentials to serve as a provisional member of the professional staff at the Hospital. *See* Pl.'s Mot., Exs. 27, 34.

## B.  The End of the Fellowship

Fast forward approximately eight months.[7] On April 2, 2012, Joanne Odom[8] sent an e-mail to Plaintiff informing her that she had a meeting with Dr. Matthew Levy and with Nelson the following day (April 3) at 1 p.m. Pl.'s Counter-Stmt., ¶ 109. Levy and Nelson both held academic appointments at Georgetown University and were employed by MedStar Georgetown University Hospital. *Id.*, ¶ 38. Levy's position was as Medical Director for Community Pediatrics. *Id.*, ¶ 66. Also on April 2, 2012, Levy had a telephone conversation with Colonel Thomas Grau, Chief, Air Force Personnel Center, Physician Education Branch, and Susan Weeks, Deputy Chief, Air Force Institute of Technology, Healthcare Education Division. *Id.*, ¶ 111. During that conversation, Levy apprised the Air Force that Plaintiff was being terminated from the fellowship program. *Id.* Grau asked Levy to send him additional information in writing indicating the specific competencies that Plaintiff had failed to satisfy. *Id.*, ¶ 113; *see also* Pl.'s

---

[6] The printed name on the letter is David Nelson. The signatures on the copies of the letter in the record are difficult to read, and it is unclear whether the letter was signed by Nelson himself or by another Hospital employee on his behalf.

[7] There is agreement that there was tension between Plaintiff and Levy during this period, although the parties vigorously dispute who is to blame. What happened during the intervening months is immaterial to the Court's resolution of the pending motions.

[8] Odom was identified in the signature of a different e-mail as "Program Administrator for Community Pediatrics, KIDS Mobile Medical Clinic/Ronald McDonald Care Mobile, Georgetown University Hospital." Pl.'s Counter-Stmt., ¶ 39.

Mot., Ex 24 (April 3, 2012, Grau Memo for the Record) ("Grau Memo"). At a meeting the next day, April 3, 2012, Levy handed Plaintiff a letter stating that she was being terminated from the fellowship program. Pl.'s Counter-Stmt., ¶ 114. The letter, on letterhead of Georgetown University Medical Center, began as follows:

> This letter is to inform you that the decision has been made to terminate your *Research Fellowship Agreement with Georgetown University Medical Center* and *dismiss you from the Community Pediatrics and Child Advocacy Fellowship Program*. This decision is made pursuant to Paragraph 8(a)(II) of the Research Fellowship Agreement, which provides for immediate termination "if Research Fellow has been intentionally or grossly delinquent in his or her conduct." As detailed below, you have repeatedly been provided notice of the deficiencies in your conduct and have failed to correct them.

Pl.'s Mot., Ex. 48 (Termination Letter), at 1 (emphasis added). After cataloguing four categories of deficiencies,[9] the letter stated that Plaintiff's Research Fellowship Agreement—the agreement that Plaintiff signed on August 25, 2011, as explained above—was terminated "effective immediately." *Id.* at 2. As a result, the letter stated that Plaintiff was "not permitted to function in any capacity as a fellow from this point forward, and you should not enter the premises of the Medical Center for any reason other than a personal health need." *Id.* The letter also explained that the Air Force would be notified regarding the decision "pursuant to the terms of the Medical Residency/Fellowship Agreement." *Id.* The letter was signed by both Nelson, listed as "Chairman, Pediatrics," and Levy, listed as "Program Director, Community Pediatrics Fellowship." *Id.* On April 4, 2012, at Plaintiff's request, Grau had a conversation with Plaintiff regarding her notification that she was terminated. Pl.'s Counter-Stmt., ¶ 121.

---

[9] The four categories are as follows: "Failure to provide reliable clinical care to pediatric patients on the [Georgetown University Hospital] mobile medical clinic and at community clinics," "Refusal to take supervisory direction or contribute to the team," "Failure to complete academic work as assigned by the Program Director," and "Failure to attend office hours." Termination Letter at 1-2.

In December 2012, after negotiations between the parties, Plaintiff was allowed to submit a backdated resignation letter. *See* Pl.'s Counter-Stmt., ¶ 130; Def.'s Resp., ECF No. 73-1, ¶ 129. Plaintiff then sent a letter to Nelson, dated April 3, 2012, "respectfully request[ing] to be released from the non-paid Post-doctoral Research Fellowship in the Department of Pediatrics at the Georgetown University Medical Center." Def.'s Mot., Ex. K (Resignation Letter); *see* Pl.'s Counter-Stmt. ¶ 130. Nelson responded to Plaintiff's letter of resignation in a letter dated December 11, 2012, on letterhead of Georgetown University Medical Center. *Id.* ¶ 132. In that letter, Nelson stated as follows: "This letter confirms that, on April 3, 2012, you requested to be released from the non-paid Post-doctoral Research Fellowship Agreement with Georgetown University Medical Center and your request was granted." *Id.* (citing Def.'s Mot., Ex. L). The letter further stated that, "[a]s a result, the Research Fellowship Agreement terminated on that date." *Id.*

On or about December 11, 2012, the date of Nelson's letter accepting Plaintiff's resignation, a *second* termination letter was drafted for Nelson's signature. *Id.*, ¶ 134. The letter was similar to the letter originally handed to Plaintiff on April 3, 2012, except that it was on letterhead of MedStar Georgetown University Hospital—rather than that of Georgetown University Medical Center—and that it removed all references to the Research Fellowship Agreement in the original letter. *Id.* Specifically, the opening and closing of the two letters, which explained the effects of the respective letters, were different, while the explanation of Plaintiff's substantive deficiencies was similar. The second letter opened as follows:

> This letter is to inform you that the decision has been made to dismiss you from the Community Pediatrics and Child Advocacy Fellowship Training Program. As detailed below, you have repeatedly been provided notice of the deficiencies in your conduct and have failed to correct them.

Pl.'s Opp'n, Ex. 57 (MedStar Termination Letter), at 1. After explaining the identified

deficiencies, with the same explanation as provided in the original termination letter, the letter

then closed by stating that "[w]e strongly advise you to contact the Georgetown University

Medical Center regarding your Research Fellowship Agreement." *Id.* at 2. While the second

termination letter was dated April 3, 2012, Nelson testified that he believed he signed the second

letter in December, 2012. Pl.'s Counter-Stmt., ¶ 134. The letter was also signed by Levy.

MedStar Termination Letter, at 2.

In addition, on December 12, 2012, Jamie Padmore, Vice President for Academic Affairs

of MedStar Health, Inc., sent a letter to Colonel Michael Tankersley—Grau's successor—

regarding the status of Plaintiff's fellowship. *See* Pl.'s Counter-Stmt. ¶ 137; Defs.' Resp. Stmt.

¶ 137 (citing Def.'s Mot., Ex. A, ¶ 2).  The letter stated as follows:

> Per your request, the purpose of this letter is to provide you with information
> regarding Dr. Antoinette Burns and the Community Pediatrics and Child
> Advocacy Fellowship Training Program at MedStar Georgetown University
> Hospital ("Pediatrics Fellowship").
>
> Dr. Burns was enrolled in the Pediatrics Fellowship at MedStar-Georgetown
> University Hospital ("Hospital") on August 1, 2011, pursuant to an agreement
> between the Hospital and Georgetown University Medical Center ("GUMC"). Dr.
> Burns was dismissed from the Pediatrics Fellowship by the Hospital on April 3,
> 2012 for poor performance.
>
> Following her dismissal from the Pediatrics Fellowship at the Hospital, Dr. Burns
> voluntarily resigned from her Research Fellowship Agreement with GUMC.
> Additionally, Dr. Burns resigned from her clinical privileges at the Hospital
> following her dismissal from the Pediatrics Fellowship.
>
> The program director, Dr. Matthew Levy, will complete a Final Summative
> Assessment of her academic performance in the Pediatrics Fellowship and send to
> you in the near future.

Pl.'s Opp'n, Ex. 58.

On January 18, 2013, the Air Force Centralized Credentials Verification Office sent a

form to MedStar Georgetown University Hospital in order to verify Plaintiff's training at the

hospital. *See* Pl.'s Opp'n, Ex. 51 (Verification Form); Pl.'s Counter-Stmt., ¶ 139. The form

included the following question: "Was this provider ever subject to any disciplinary action, such

as admonition, reprimand, suspension, or termination?" Verification Form, at 1. The answer

"yes" to that question was marked. *Id.* The completed form included a notation stating, "see

attached document dated 2/4/2012."[10] *Id.* Levy signed the form, which was dated February 4,

2013. *Id.* The attached document was a Final Summative Assessment prepared regarding

Plaintiff's fellowship; the document was on the letterhead of MedStar Georgetown University

Hospital and was prepared and signed by Levy. Pl.'s Opp'n, Ex. 52, at 1, 4. The introduction to

the document was as follows:

> **Introduction:** Dr. Antoinette Burns enrolled in the 2-year Georgetown University
> Hospital fellowship program in Community Pediatrics and Child Advocacy on
> August 1, 2011. Dr. Burns was actively enrolled in the Air Force and was seeking
> this additional training with the support of her military supervisors. Dr. Burns
> completed 8 months of the fellowship program and was subsequently dismissed
> for poor academic performance on April 3, 2012. The following is a summary of
> Dr. Burns' academic performance based on the six core competencies: …

*Id.* at 1. Plaintiff was then evaluated according to six core competencies. The letter concluded as

follows:

> In sum, Dr. Antoinette Burns' performance was unacceptable as measured by all
> six core competencies. Her academic performance was insufficient for that of an
> advanced trainee. Dr. Burns received ongoing assessments, formative and
> summative feedback, and was unable to modify her performance, actions and
> behaviors to an acceptable level. The program made the decision to dismiss her
> from the academic program effective April 3, 201[2].[11]

*Id.* at 3-4.

---

[10] It is apparent that the date in question was actually 2/4/2013 rather than 2/4/2012. *See* Pl.'s
Opp'n, Ex. 52.

[11] Although the letter states that Plaintiff was dismissed effective April 3, *2013*, it is apparent that
the correct year of her dismissal was actually *2012*.

In light of the foregoing events, Plaintiff filed this action, and now before the Court are Defendants' several motions for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record – including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence – in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## III. DISCUSSION

The Court first discusses the motions of Defendants Georgetown University Medical Center ("the Medical Center" or "GUMC") and MedStar Georgetown University Hospital ("the Hospital") for summary judgment on Plaintiff's contract-based claims (Counts I, II, and III). The Court then turns to the motion of Defendants MedStar Georgetown University Hospital and Levy for summary judgment on Plaintiff's tort-based claims (Counts IV, V, and VI).

## A.  Contract Claims

Plaintiff asserts three contract-based claims: a claim for breach of contract, based on a third-party beneficiary theory in connection with the contract signed by the Air Force (Count I); a claim for breach of contract, in connection with the contract signed by Plaintiff (Count II); and

a claim for breach of implied covenant of good faith and fair dealing (Count III). Each of these three claims is asserted against both Georgetown University Medical Center and MedStar Georgetown University Hospital. Georgetown University Medical Center presents several arguments for summary judgment on each of the claims against it, which the Court reviews and addresses below; the Hospital joins each of those arguments and also argues that the contractual claims against it fail as a matter of law because the Hospital was not a party to any of the contracts that form the basis of Plaintiff's claims. Defendants also argue that, insofar as it appears that Plaintiff is asserting new theories for her contract-based claims in her Opposition, she may not amend her complaint through her Opposition, and those claims fail on the merits as well.

Before addressing the parties' specific arguments, the Court first sets down several principles of law that guide the discussion below. First, neither party disputes that District of Columbia law applies to each of the claims in this case. Therefore, the Court will apply District of Columbia law to all of the claims in this case. Second, under District of Columbia law, contract interpretation is a matter of law. *Fort Lincoln Civic Assoc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008). Specifically, " '[i]n construing a contract, the court must determine what a reasonable person in the position of the parties would have thought the disputed language meant.' " *Id.* (quoting *Unfoldment, Inc. v. District of Columbia Contract Appeals Bd.*, 909 A.2d 204, 209 (D.C. 2006)). " 'Where the language in question is unambiguous, its interpretation is a question of law for the court.' " *Id.* (citation omitted). " 'A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract … and will not torture words to import ambiguity where the ordinary

meaning leaves no room for ambiguity.' " *Id.* (citation omitted). The Court proceeds to discuss the individual claims with these principles in mind.

### 1. Count I: Breach of Contract (Third Party Beneficiary)

Plaintiff's first breach of contract claim is based on a theory that Plaintiff is a third-party beneficiary of the agreement entered into by the United States (i.e., the Air Force) and Defendant Georgetown University Medical Center. Specifically, Plaintiff claims that both institutional defendants breached that agreement by (a) terminating Plaintiff without due process; (b) failing to provide 30-day notice for termination of the agreement with the United States/the Air Force; and (c) for failing to provide a competent fellowship training program.[12] The basis for this claim is the Medical Residency/Fellowship Agreement signed by the Air Force and by Georgetown University Medical Center, discussed above. *See* Pl.'s Opp'n at 33-37. Both institutional defendants argue that this claim fails because (1) Plaintiff was not a third-party beneficiary of the Medical Residency/Fellowship Agreement and (2) Defendants did not breach any substantive obligations of this agreement. The Hospital also argues that it was not a party to this agreement and, therefore, cannot be liable for any alleged breach thereof.

The Court assumes without deciding that Plaintiff was a third-party beneficiary of this agreement. Nonetheless, the Court concludes that, based on the contract as properly interpreted, no reasonable jury could conclude that Defendants breached the agreement. The Court also

---

[12] In the Second Amended Complaint, Plaintiff alleged, as one of three bases for the third-party beneficiary contract claim, that Plaintiff was terminated without notice *and* without due process. Comp. ¶ 27a. Plaintiff separately alleged that Defendants failed to provide 30 days notice of the termination of the Agreement, *id.*, ¶ 27b, which appears to be a reference to the 30-day notice provision of the Medical Residency/Fellowship Agreement. With respect to the former allegation, Plaintiff has abandoned the general "notice claim," she pursues only the due process claim and 30-day notice claim under the Medical Residency/Fellowship Agreement. *See* Pl.'s Opp'n at 35-37.

concludes that the Hospital was not a party to the Medical Residency/Fellowship Agreement—or any relevant agreement with the United States that could be the source of the breach of contract claim alleged by Plaintiff.

The Court first addresses whether Defendant MedStar Georgetown University Hospital is a party to this agreement. With respect to the status of the Hospital, it is most important that the contract, by its plain language, is an agreement between the United States of America, entered by an official of the Air Force Institute of Technology, and Georgetown University Medical Center, signed by David Rubenstein, Vice President for Financial Planning and Analysis. *See* Medical Residency/Fellowship Agreement, at 2. The agreement refers to two sides of the agreement: the United States (or the Air Force), on one side, and "the institution," a consistent reference to Georgetown University Medical Center, on the other side. *Id.* at 1-2. Tellingly, the agreement refers to MedStar Georgetown University Hospital as an institution that is separate and distinct from the parties to this agreement. Specifically, the institution—Georgetown University Medical Center—agreed to *separately* enter into a contract with the Hospital such that the Hospital would provide certain services to the fellow. *Id.* at 1. That reference confirms that the Hospital is a stranger to the contract and that it has undertaken no obligations as a result of it. Similarly, the promise of the University to include certain provisions in its separate contract with the Hospital, *id.* at 2, does not make the Hospital a party to the contract with the United States. Rather the unambiguous reading of the contract as a whole is that it is an agreement only between the United States (through the Air Force) and Georgetown University Medical Center.[13] Because the

---

[13] Nor does the separate agreement between the University and the Hospital as to Plaintiff's fellowship make the Hospital a party to the University's contract with the United States, *see* Pl.'s Opp'n, Ex. 55, at 1, in any form.

Hospital is not a party to the contract with the United States, it cannot be liable for any breaches of that contract.

Having established that the Hospital is not a party to the contract with the United States, the Court turns to the several ways in which Plaintiff claims that Defendants breached the contract.[14] First, Plaintiff claims that she was wrongfully terminated without due process. Defendants argue that there is no obligation related to due process embodied in the Medical Residence/Fellowship Agreement. Plaintiff effectively concedes as much and relies, in her Opposition, on characterizations of the Air Force's expectations. *See* Pl.'s Opp'n at 36-37 (citing Pl.'s Counter-Stmt., ¶¶ 48-49). But the Air Force's unilateral expectations form no part of the contract. The two-page Medical Residency/Fellowship Agreement is unambiguous and it contains no such due process requirement. *See* Def.'s Mot., Ex. G. Because the contract is unambiguous, extrinsic evidence about the parties' understandings have no relevance to the interpretation of the agreement of the parties. *See Fort Lincoln New Town*, 944 A.2d at 964. That is, the Air Force's unilateral intentions as to the educational experiences of its officers—either in general or as specifically applied to the program in which Plaintiff participated—form no part of the bargain between the United States and the institutional defendants. Accordingly, Plaintiff's claim of breach of contract based on a failure to provide due process fails as a matter of law against both institutional defendants.

Second, Plaintiff claims that Defendants violated the 30-day notice requirement of the Medical Residency/Fellowship Agreement. Specifically, the agreement states that the "right is reserved for either party hereto to terminate this training agreement at any time by serving notice

---

[14] Once again, the Court assumes without deciding that Plaintiff qualifies as a third-party beneficiary for the purposes of this discussion.

on the other party thirty days in advance of such action." Def.'s Mot., Ex. G, at 2. Plaintiff claims

that Defendants violated this provision because they did not give the Air Force 30 days notice

before they terminated Plaintiff's fellowship. Specifically, they claim that Defendant first gave

the Air Force notice on April 2, 2012, through the telephone conversation between Levy and

Grau, but that Plaintiff was terminated only one day later—on April 3, 2011. *See* Pl.'s Counter-

Stmt., ¶¶ 111, 114. Plaintiff conflates the two institutional defendants—the Medical Center and

the Hospital—as she does throughout her briefing. Doing so is fatal to this prong of her first

contract claim. Insofar as the Hospital terminated her from its pediatrics training program on

April 3, 2012, that action cannot serve as the basis for the breach of contract claim because the

Hospital is not a party to the agreement with the United States; therefore, it is not required to

abide by the notice provision of that agreement. With respect to Georgetown University Medical

Center, Plaintiff's claim fails because, although the University initially purported to terminate her

from the fellowship program, it ultimately allowed her to retroactively exit the contract

voluntarily *prior* to the termination, as described above. Because that voluntary release took

effect prior to the termination, legally, there was no termination by Defendant Georgetown

University Medical Center that could violate the 30-day notice provision.

Third, Plaintiff claims that Defendants violated the Medical Residency/Fellowship

Agreement by failing to provide a "competent" or "adequate" program. *See* Compl. ¶ 27c; Pl.'s

Opp'n at 36. However, the Medical Residency/Fellowship Agreement includes no such promise

to the United States. The contract states as a factual premise that Plaintiff is undergoing training

in pediatrics at the signatory institution, but it does not include *any* promises regarding the

content or quality of that training. Instead, the content of the contract is limited to insurance,

liability, and other such technical matters. *See* Def.'s Mot., Ex. G. As explained above, because

the contract is unambiguous, no outside evidence as to either party's understanding related to the contract is relevant to its legal meaning. Nor are any other agreements outside of the four corners of the Medical Residency/Fellowship Agreement incorporated into it such that they create any binding obligations owed to the United States. In short, neither this agreement nor any other agreement creates any promise to the United States as to the content of the training program into which Plaintiff entered. Accordingly, Defendants cannot be liable to Plaintiff, even if she qualified as a third-party beneficiary, for failure to provide a "competent" or "adequate" training program.

For all of these reasons, Count I – Breach of Contract, on a third-party beneficiary theory, fails as a matter of law as to both Georgetown University Medical Center and as to MedStar Georgetown University Hospital, and the Court grants summary judgment to Defendants on this claim.

### 2.  Count II: Breach of Contract

Plaintiff's second breach of contract claim is based on Fellowship Agreement that Plaintiff herself signed directly. Compl. ¶ 28. As described fully above, that document is titled Research Fellowship Agreement: Georgetown University Medical Center. Def.'s Mot., Ex. I ("Research Fellowship Agreement"), at 1. That document was signed by Plaintiff, "for postdoctoral fellow," and by several University officials "for Georgetown University Medical Center." *Id.* at 4. That agreement set out the obligations of Plaintiff—the "Research Fellow"— and of the Georgetown University Medical Center. *See id.* at 1-4. It took effect on August 1, 2011. *Id.* at 1; *see also* Compl. ¶ 28. In addition, to the Research Fellowship Agreement itself, both Plaintiff and a representative of Georgetown University Medical Center signed the offer letter from Georgetown University Medical Center regarding Plaintiff's Post-doctoral Research

Fellowship. Def.'s Mot., Ex. H, at 1-2. In essence, Plaintiff claims that Defendants breached

what she refers to as the "Fellowship Agreement" by terminating Plaintiff without notice; by

failing to provide her due process; failing to provide a competent fellowship program; failing to

provide a suitable environment for an educational research experience; and failing to provide a

research training and an educational program. *See* Compl. ¶ 28. Both institutional defendants

argue that this claim fails because the Research Fellowship Agreement was voluntarily

terminated by Plaintiff, terminating all obligations of the parties under the agreement. The

Hospital also argues that it was not a party to this agreement and, therefore, cannot be liable for

any alleged breach thereof.

  The Court first addresses whether Defendant MedStar Georgetown University Hospital is

a party to the agreement that is the basis for this claim. The Court then addresses Defendants'

argument that all obligations under the contract were terminated by the voluntary early

termination of the contract.

  As with the Air Force agreement discussed above, with respect to the status of the

Hospital in the contract signed by Plaintiff, it is most important that the contract, by its plain

language, is an agreement between Plaintiff and Georgetown University Medical Center. *See*

Defs.' Exs. H, I. As noted above, the Research Fellowship Agreement was signed by several

representatives of Georgetown University Medical Center and explicitly states that those

individuals signed the agreement "for Georgetown University Medical Center." Research

Fellowship Agreement at 4. Moreover, the agreement itself includes the name "Georgetown

University Medical Center"—and the names of no other institutions—in its title. *Id.* at 1. Finally,

the agreement spells out the obligations of Plaintiff and of Georgetown University Medical

Center, but not those of the Hospital.[15] *Id.* at 1-4. In short, the unambiguous reading of the contract as a whole is that it is an agreement only between Plaintiff and Georgetown University Medical Center. Because the Hospital is not a party to the contract with Plaintiff, it cannot be liable for any breaches of that contract—just as it is not liable for breaches of the contract with the United States.[16]

Having established that the Hospital is not a party to the contract with Plaintiff, the Court turns to Defendants' argument that they cannot be liable for any breaches of the Research Fellowship Agreement because the parties voluntarily terminated that agreement. Plaintiff does not dispute that a voluntary termination of the Research Fellowship Agreement would foreclose any claims for any putative breach of that contract. *See* Pl.'s Opp'n at 37-39. Furthermore, Plaintiff responds that she "actually agrees that the letters exchanged between Lt. Col. Burns and Dr. Nelson in an attempt to settle the dispute did in fact rescind the Fellowship agreement *in toto* with the Georgetown partners." *Id.* at 37. In other words, Plaintiff claims that, in addition to rescinding the Research Fellowship Agreement with Georgetown University Medical Center, the exchange of letters *also* rescinded any agreement with the Hospital. Furthermore, Plaintiff claims

---

[15] The two references to the Hospital in the Research Fellowship Agreement do not make the Hospital a party to this agreement. Specifically, the agreement states that Plaintiff will provide services at the Hospital and that the Hospital together with Georgetown University Medical will provide liability insurance. Research Fellowship Agreement at 1-2. But these references do not in any way themselves impose binding obligations on the Hospital or make the Hospital a party to the contract. Notably, Georgetown University Medical Center entered into a *separate* contract with the Hospital to ensure the provision of insurance. *See* Pl.'s Opp'n, Ex. 55, at 1. That *separate* contract confirms that the Hospital is a stranger to the contract between Plaintiff and Georgetown University Medical Center.

[16] Plaintiff also attempts to bind the Hospital to the agreement based on a theory of apparent authority. But apparent authority is wholly inapplicable to the contracts at issue in this case. The signatories to the agreement did not appear to sign it on behalf of the Hospital—for all the reasons detailed above. Therefore, it is simply irrelevant whether they could have bound the Hospital under the cloak of "apparent authority" had they purported to do so.

that, as a result, the subsequent termination by the Hospital and Final Summative Assessment prepared by Levy constitute defamation, and that those subsequent actions constitute a breach of the parties' "settlement agreement." Finally, as a result of *that* breach, according to Plaintiff's theory, Plaintiff's claims for breaches of the original Research Fellowship Agreement are no longer barred by the voluntary release of that agreement. In turn, Defendants argue that it is too late to introduce a claim, which is not in the Complaint, based on a breach of the so-called settlement agreement at the summary judgment stage of this case, and in any event, there was no breach of that agreement. The Court agrees with Defendants that, notwithstanding any events that took place up to the date of the mutual release, the parties' mutual release of their obligations under the Research Fellowship Agreement bars Plaintiff's breach of contract claim stemming from that agreement.

As noted above, Plaintiff sent a letter to Nelson, dated April 3, 2012, "respectfully request[ing] to be released from the non-paid Post-doctoral Research Fellowship in the Department of Pediatrics at the Georgetown University Medical Center." Resignation Letter at 1. In a letter on Georgetown University Medical Center letterhead, Nelson accepted the resignation and stated as follows: "This letter confirms that, on April 3, 2012, you requested to be released from the non-paid Post-doctoral Research Fellowship Agreement with Georgetown University Medical Center and your request was granted." *Id.* (citing Def.'s Mot., Ex. L). The letter further stated that, "[a]s a result, the Research Fellowship Agreement terminated on that date." *Id.* This exchange of letters is enough to terminate the obligations of all parties under the Research Fellowship Agreement. *See* Restatement (Second) of Contracts § 283 (1981) (rescission occurs when each party releases the other party from all contractual obligations); *Cooper v. Cooper*, 35 A.2d 921, 923 (D.C. 1944) (" 'When a party, even without right, claims to rescind a contract, if

the other party agrees to the rescission, or does not object thereto, and permits it to be rescinded, the rescission is by mutual consent. … It is evident that, when a contract is rescinded by mutual consent or otherwise, no action can be maintained for a breach thereof.' " (quoting *Ralya v. Atkins*, 61 N.E. 726, 729 (Ind. 1901)); *Mazur v. Young*, 507 F.3d 1013, 1020 (6th Cir. 2007) ("There can be no liability for breach of contract under a contract that has been rescinded."); *see also Hershon v. Hellman Co.*, 565 A.2d 282, 283 (D.C. 1989) (parties may freely modify contract by consent).

Plaintiff now claims for the first time that the agreement to rescind the contract was breached by Defendant's *subsequent* conduct. Therefore, Plaintiff claims that she may pursue breach of contract claims that are based on the original contract.[17] As an initial matter, the Court agrees with Defendants that it is too late in this litigation to rely on this newly unveiled claim of a breach of the agreement to mutually release obligations under the Research Fellowship Agreement. That claim is nowhere encompassed within the Second Amended Complaint either as a stand-alone claim or as the basis for asserting a breach of contract claim with respect to the Research Fellowship Agreement. Plaintiff may not attempt to amend her complaint through her opposition in order to assert new claims or new bases for the claims that she originally asserted.

The Court also agrees with Defendants that the record does not support a conclusion that the mutual release of obligations under the Research Fellowship Agreement was breached by Defendants' subsequent conduct. The exchange of letters between Plaintiff and Georgetown

---

[17] The Court does not understand Plaintiff to be now attempting to assert a new stand-alone claim for breach of contract with respect to the mutual release. But if Plaintiff were attempting to present such a claim, the Court would agree with Defendants that it too late to do so given that no such claim is encompassed within the operative complaint. The Court would also conclude that such a claim fails a matter of law for the reasons explained in connection with the breach of contract claims presented in the operative complaint.

University Medical Center makes no reference to the Hospital or to the Community Pediatrics and Child Advocacy Fellowship Program at the Hospital. Plaintiff's letter was addressed to Nelson in his capacity as "Professor and Chair, Georgetown University Children's Medical Center," Def.'s Mot., Ex. K, and only requested for Plaintiff to be released from her "non-paid Post-doctoral Research Fellowship in the Department of Pediatrics at the Georgetown University Medical Center." *Id.* Nelson responded in kind, writing on letterhead of Georgetown University Medical Center and granting Plaintiff's requested to be released from the "non-paid Post-doctoral Research Fellowship Agreement with Georgetown University Medical Center." *Id.*, Ex. L. The language in both parts of this exchange mirrored the language in the fellowship offer letter from Georgetown University Medical Center. *Id.*, Ex. H. Notably, Plaintiff's request for release contained no mention of the Hospital or of the Community Pediatrics and Child Advocacy Fellowship Program, even though the initial termination letter that Plaintiff was given on April 3, 2012, referred explicitly to that program. *See* Termination Letter at 1. Similarly, the response to Plaintiff's request for release was sent only from Georgetown University Medical Center, and contained no mention of either the Hospital or the Community Pediatrics and Child Advocacy Fellowship Program. Instead, it concluded by stating only that the Research Fellowship Agreement—which the Court concluded above was only between Plaintiff and the Medical Center—was terminated as of April 3, 2012. *See* Def.'s Mot., Ex. L. The Court concludes that the unambiguous meaning of the agreement embodied in this exchange of letters is that Plaintiff and Georgetown University Medical Center agreed to release each other from their obligations and that the rescission had no impact on the legal basis for any relationship between Plaintiff and the Hospital or the Community Pediatrics and Child Advocacy Fellowship Program.

Because the mutual release did not affect Plaintiff's relationship with the Hospital, there was no breach of the mutual release agreement when the representatives of the Hospital, including Levy, prepared and sent the Verification Form and the Final Summative Assessment to the Air Force, as described fully above. In turn, because there was no such breach, the mutual rescission of the Research Fellowship Agreement remains fully operative, and Plaintiff may not pursue a claim for a breach of that contract. For that reason, Plaintiff's breach of contract claim (Count II) fails as a matter of law.

### 3.  Count III: Breach of Implied Covenant of Good Faith and Fair Dealing

Next Plaintiff claims that Defendants Georgetown University Medical Center and MedStar Georgetown University Hospital breached the implied covenant of good faith and fair dealing in connection with the agreements that the Court discussed above. The Court concludes that this claim fails as a matter of law with respect to both institutional defendants for the reasons discussed here.

To the extent that Plaintiff asserts an implied covenant claim against the Hospital, the claim fails at the outset. The Court concluded above that the Hospital was neither a party to the agreement with the United States nor a party to the agreement with Plaintiff. *See supra*, sections III.A.1 and III.A.2. Accordingly, Plaintiff may not assert an implied duty claim against the Hospital based on either of those agreements, and this claim fails as a matter of law as to the Hospital.[18]

---

[18] Plaintiff introduces yet another new theory in a footnote in her opposition—of a breach of an implied-in-fact contract. Pl.'s Opp'n at 39 n.10. Plaintiff's attempt to do so in this cursory fashion is both too little and too late. Plaintiff may not assert any such new claim at this point in these proceedings not encompassed in the operative complaint.

Turning to the implied covenant claims against Georgetown University Medical Center, the Court looks first at the Medical Center's agreement with Plaintiff, followed by the Medical Center's agreement with the United States.

With respect to the Medical Center's agreement with Plaintiff, the Court concluded above that Plaintiff may not assert any claims under that agreement because of the voluntary rescission and release regarding that agreement. *See supra*, section III.A.2. For those same reasons, Plaintiff may not assert any claims based on any implied duties associated with that contract. *See Cooper*, 35 A.2d at 923; *Mazur*, 507 F.3d at 1020.

The remaining basis for Plaintiff's breach of implied covenant claim is Georgetown University Medical Center's agreement with the United States. Importantly, that agreement only sets out minimal obligations, primarily regarding technical matters such as responsibilities regarding Plaintiff's remuneration, insurance, and liability. Medical Residency/Fellowship Agreement at 1-4. It does not establish any obligations regarding the content of the Fellowship or regarding the Medical Center's relationship with Plaintiff. As explained next, Plaintiff has not identified any actions that qualify as "evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance" in connection with the minimal obligations set out by this agreement. *Hais v. Smith*, 547 A.2d 986, 987–88 (D.C. 1988)

Plaintiff enumerates several actions that she claims are a breach of the implied covenant associated with that agreement: (a) Levy's sending copies of his correspondence regarding Plaintiff to an internal human resources official in the Department of Pediatrics; (b) Levy's scheduling of a shift for Plaintiff during a time when she had a conflict; (c) the creation of a second termination letter by the Hospital; (d) the Hospital informing the Air Force that Plaintiff was terminated from her Program by the Hospital; and (e) the sending of the Final Summative

Assessment to the Air Force. All of the actions enumerated here *other than* the first action—the sending of correspondence—were undertaken by the Hospital and by Levy in his capacity as an employee of the Hospital. Specifically, the scheduling of Plaintiff's shift was a matter of business pertaining to work at the Hospital. Similarly, the other claims regarding the termination of Plaintiff's relationship with the Hospital and associated documentation pertain to the Hospital alone. But actions by the *Hospital* and its agents cannot serve as the basis for an implied duty claim against *Georgetown University Medical Center*—particularly because the agreement did not impose any obligations on the Hospital in the first instance. Accordingly, none of these actions can serve as the basis for an implied covenant claim against the Medical Center.

Finally, the Court turns to the single action that Plaintiff identifies as a basis for the implied covenant claim against Georgetown University Medical Center that at least *arguably* has a connection to that defendant: Levy's act of sending e-mail correspondence relating to Plaintiff to Nora Frieden, a human resources official in the Department of Pediatrics, which occurred prior to the April 3, 2012, meeting at which Plaintiff was informed that she was being terminated. *See* Pl.'s Opp'n at 40 (citing Pl.'s Counter-Stmt. ¶¶ 99-102). Notwithstanding Plaintiff's broad characterizations of this pattern of activity, the record only shows four e-mails that Levy sent to Frieden, *see* Pl.'s Counter-Stmt. ¶¶ 99, 100, 102:

1. On October 11, 2011, Levy sent an e-mail to Burns, on which he blind carbon copied ("BCC'ed") Frieden and carbon copied ("CC'ed") Ana Caskin, the former interim program director of the pediatrics fellowship program. In that e-mail, Levy states that he "would like to sit down … to discuss how things are going with the fellowship and to follow up on our conversation a few weeks ago." Pl.'s Opp'n, Ex. 40; *see also* Pl.'s Counter-Stmt. ¶ 99.

2. On November 17, 2011, Levy forwarded to Frieden and to Caskin— without any comment—an e-mail exchange between him and Burns regarding the scheduling of a meeting between the two of them. Pl.'s Opp'n, Ex. 44; *see also* Pl.'s Counter-Stmt. ¶ 100.

3.  On January 20, 2012, Levy forwarded to Frieden—again without comment—an e-mail that Caskin had sent to Levy and to Odom, the program administrator, regarding Burn's performance, specifically concerning her coverage of the clinic to which she was assigned. Defs.' Tort Mot., Ex. 19; *see also* Pl.'s Counter-Stmt. ¶ 102.

4.  Also on January 20, 2012, Levy forwarded to Frieden—again without comment—an e-mail that Odom had sent to Levy regarding Burn's performance, specifically about suggestions that Burns had made to a departmental staff member regarding other employment opportunities. Defs.' Tort Mot., Ex. 31; *see also* Pl.'s Counter-Stmt. ¶ 102.

The record shows that, contrary to Plaintiff's characterization, Levy's decision to send some of his e-mail correspondence with and regarding Plaintiff—specifically the four e-mails described above—to a Department of Pediatrics human resources official was an ordinary act, particularly given the undisputed tensions regarding Plaintiff's role at the Hospital. Moreover, this activity by Levy has *no* connection to the minimal obligations that the Medical Center undertook with respect to the United States, which pertained to liability, insurance, and related technical matters. Particularly in light of the technical nature of the obligations under the contract, Levy's action does not "evade the spirit of the contract" with the United States, "willfully render[] imperfect performance" of that contract, or interfere with the United States' performance of that contract. *Hais*, 547 A.2d at 987–88. Nor did Levy's actions in any way have "the effect of destroying or injuring the right of the [United States] to receive the fruits of the contract." *Id.* (citation and internal quotations omitted). Therefore, no reasonable jury could conclude that Levy's sending of e-mail correspondence to an internal human resources official constituted a breach of the implied covenant of good faith and fair dealing stemming out of the agreement with the United States. Accordingly, for all of these reasons, the Court concludes that Plaintiff's implied covenant claim (Count III) fails as a matter of law.

\*       \*       \*

In sum, for all of the reasons set out above, the Court concludes that each of Plaintiff's contract based claims, Counts I through III, fail as a matter of law, and the Court grants summary judgment to Defendants on them.[19]

## B.  Tort Claims (Counts IV, V, and VI)

Plaintiff asserts three tort-based claims in the Second Amended Complaint: a claim for the negligent defamation against Levy and the Hospital (Count IV); a claim for intentional defamation against Levy alone (Count V); and a claim for intentional interference with prospective economic advantage against Levy (Count VI). Defendants argue that each of these claims fails as a matter of law. The Court discusses the defamation claims, followed by the claim for intentional interference with prospective economic advantage.

### 1.  Defamation Claims

Plaintiff's two defamation claims are based on the transmission of the Verification Form and the Final Summative Assessment from the Hospital to the Air Force. With respect to both of the defamation claims, Defendants argue that the claims fail for three independent reasons: (a) because the claims are based on materials precluded from serving as the basis of such claims by the District of Columbia's peer review statute; (b) because the common interest privilege among the parties bars the claims; and (c) because the content of the communications that are the basis

---

[19] Insofar as Plaintiff attempts to assert in her opposition contract-based claims on the basis of a "super-contract" that ties together multiple agreements by the various parties, any such claim fails because it is not fairly encompassed within the operative complaint. As noted above, Plaintiff may not amend her complaint via her opposition. Moreover, any such claim would fail as a matter of law. Based on the unambiguous language of the contracts with Plaintiff, there is no basis to conclude that there is a chain of contracts that establishes *any* additional obligations on either institutional defendant that runs to Plaintiff. The obligations owed to Plaintiff are limited to the four corners of the contracts discussed in great depth above. No further discussion of Plaintiff's new multiple contract theory is necessary to reject any such claim as a matter of law.

of the claims does not constitute defamation as a matter of law. Because the Court concludes that the common interest privilege bars the defamation claims on the basis of the present record, and the Court grants summary judgment to Defendants on that basis, the Court does not address Defendants' alternative arguments for summary judgment regarding these claims.[20]

"To make out a successful defamation action under District of Columbia law, a plaintiff must show … 'that the defendant published the statement without privilege to a third party.' " *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)). "The common interest privilege protects otherwise defamatory statements made '(1) ... in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.' " *Id.* (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). "Two circumstances foreclose asserting the privilege: first, excessive publication, defined as 'publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest,' and, second, publication with malice, which, within the context of the common interest privilege, is 'the equivalent of bad faith.' " *Id.* (quoting *Moss*, 580 A.2d at 1024-25). Finally, "[w]hile the defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff." *Id.*

---

[20] For that same reason, the Court need not resolve Defendants' [65] Motion *In Limine* to Preclude Plaintiff's Use at Trial of Evidence Inadmissible under the District of Columbia Peer Review Statute. Because the Court grants summary judgment to Defendants on all claims, the Court denies Defendants' Motion *In Limine* as moot.

Plaintiff does *not* argue that the parties do not qualify for the common interest privilege as a general matter. Instead, she only argues that the record demonstrates that the transmission of the Verification Form and of the Final Summative Assessment was done with malice. However, the Court concludes that the record does not support a conclusion that these actions were "imbued with malice." *Id.* at 858.

"District of Columbia law sets a high standard for establishing malice sufficient to defeat the protections of the common interest privilege." *Id.* at 859. Malice is defined as "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss*, 580 A.2d at 1025. Furthermore, "even a showing of ill will does not 'forfeit the privilege so long as the primary purpose is to further the interest which is entitled to protection.' " *Mastro*, 447 F.3d at 859 (quoting *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C. 1995)).

To show malice, Plaintiff relies substantially on the content of the allegedly defamatory statements—the Verification Form and the Final Summative Assessment. However, "[u]nless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,' malice must be proven by extrinsic evidence." *Moss*, 580 A.2d at 1024 (quoting *Ford Motor Credit v. Holland*, 367 A.2d 1311, 1314 (D.C. 1977)). Here, the content of the allegedly defamatory documents defies that characterization. While Plaintiff contests the truthfulness of both of those documents, and while the content of the Final Summative Assessment is undoubtedly critical of Plaintiff's performance, it is far from "excessive, intemperate, unreasonable, and abusive." Rather, it contains a critical assessment of Plaintiff's performance, but in professional language. Moreover, there is undisputed evidence in the record that this assessment of Plaintiff's performance was

provided in response to an explicit request from Air Force officials, who were seeking information about the performance and experience of their officer whose participation in the training program was funded by the Air Force. *See* Pl.'s Counter-Stmt. ¶ 113; Grau Memo at 1. As a result, because the Court must exclude the content of the allegedly defamatory statements from its assessment of malice, the Court turns to other evidence that Plaintiff identifies as a basis for her malice argument.

As evidence of malice, Plaintiff also points to Defendants' knowledge that the Verification Form and Final Summative Assessment were to be used for credentialing. However, their knowledge, in fact, supports the opposite inference. Air Force officials requested that the Hospital and its officials fill out a form regarding Plaintiff's fellowship experience and, specifically, requested a review of how Plaintiff satisfied—or failed to satisfy—the core competencies required by the program. Defendants did exactly that. Rather than showing malice, this sequence of events shows that the " 'primary purpose [of the communications] is to further the interest which is entitled to protection.' " *Mastro*, 447 F.3d at 859 (citation omitted). The evidence on which Plaintiff relies for a showing of malice amounts to a claim that the documents transmitted were themselves false and that *might* have negative consequences upon submission to her employer, the Air Force. The Court concludes that Plaintiff "has presented no evidence suggesting that the communication of that decision to a small group of appropriate individuals was driven by anything more than the mundane need for businesses and governments to keep track of personnel actions." *Id.*

In sum, Plaintiff has "not adduced any evidence raising a genuine issue that [Defendants] acted outside the scope of applicable privileges—here, the common interest privilege"—in transmitting the Verification Form and the Final Summative Assessment to the Air Force.

Accordingly, the common interest privilege serves to bar both of Plaintiff's defamation claims, and the Court grants summary judgment to Defendants regarding the defamation claims.[21]

### 2.  Intentional Interference Claim

"To establish a claim for tortious interference with existing or prospective business relations under District of Columbia law," Plaintiff must show "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the alleged interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 857 F. Supp. 2d 97, 103 (D.D.C. 2012) (citing *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)).

Plaintiff claims that the Final Summative Assessment was sent by Levy to the Air Force, Plaintiff's employer, "in order to interfere with her prospective economic advantage in her employment." Compl. ¶ 36. Defendant argues that Plaintiff has not identified any business expectancies that could serve as the basis for this claim; that Levy was not aware of any such expectancy; and that Levy did not defame Plaintiff through his actions. Plaintiff responds that the expectancy on which she bases her claim was "unencumbered relations with her employer, unencumbered credentialing, and unencumbered future relations with the Air Force." Pl.'s Opp'n at 60.

Plaintiff's claim fails at the necessary first step of identifying a "valid business relationship or expectancy." Plaintiff almost wholly relies on future relations with Plaintiff's current employer, the Air Force. *See id.*; *see also id.* at 60-61 (emphasis on future possibility of promotions within the Air

---

[21] Therefore, there is no need to address the parties' other arguments regarding the viability of the defamation claims, including those based on the District of Columbia peer review statute.

Force and discussing Plaintiff's future career at the Air Force). However, the tort of intentional interference with prospective economic advantage only can only be grounded in " 'business expectancies, not grounded on *present* contractual relationships, but which are commercially reasonable to anticipate.' " *Democratic State Comm. of D.C. v. Bebchick*, 706 A.2d 569, 573 (D.C. 1998) (quoting *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)) (emphasis added). Therefore, to the extent that Plaintiff's claim is based on her "present contractual relationship[]" with the Air Force, it fails as a matter of law.

Other than impacts on her relationship with the Air Force, the only other basis that Plaintiff identifies for this claim is her ability to obtain credentials in the future at other medical facilities. As an initial matter, the Court agrees with Defendants that this purported expectancy is not fairly encompassed within the claim presented in the operative complaint. *See* Compl. ¶ 36 (identifying only "prospective economic advantage in her employment" as expectancy). In any event, Plaintiff's suggestion that the Final Summative Assessment will interfere with future attempts to obtain medical privileges is unduly speculative. Her general identification of credentialing challenges, in the abstract, simply does not qualify as a particular business expectancy of the sort that can serve as the basis for an intentional interference claim. *See Carr*, 395 A.2d at 84 (Remote expectancies "are not of the character that may be protected by this cause of action for the tort of interference with property"); *see also Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010) (successful claim "appears to require rather specific business opportunities" rather than "generic opportunities of any successful enterprise"). Accordingly, the Court grants summary judgment to Defendant Levy on the intentional interference with prospective advantage claim, as well.

*     *     *

In sum, for the reasons explained above, the Court grants summary judgment to Defendants on the three-contract based claims and on the three tort-based claims in this action.

With respect to Defendants' [65] Motion *In Limine* to Preclude Plaintiff's Use at Trial of Evidence Inadmissible under the District of Columbia Peer Review Statute, the Court denies that motion as moot because the Court grants summary judgment in Defendants' favor without reaching the question whether reliance on certain materials is barred by the District of Columbia's peer review statute. With respect to Plaintiff's [69] Motion *In Limine* to Exclude Evidence of Settlement Discussions, the Court does not rely on evidence that Plaintiff seeks to exclude through this motion. Because the Court grants summary judgment to Defendants in all respects, it has no need to resolve Plaintiff's Motion *In Limine* and denies that motion as moot.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant MedStar Georgetown University Hospital's [62] Motion for Summary Judgment as to Counts I, II, and III; GRANTS Defendant Georgetown University Medical Center's [63] Motion for Summary Judgment as to Counts I, II, and III; and GRANTS Defendant MedStar Georgetown University Hospital's and Defendant Matthew Levy, M.D.'s [64] Joint Motion for Summary Judgment as to Counts IV, V, and VI.

In addition, the Court DENIES AS MOOT Defendants' [65] Motion *In Limine* to Preclude Plaintiff's Use at Trial of Evidence Inadmissible under the District of Columbia Peer Review Statute and Plaintiff's [69] Motion *In Limine* to Exclude Evidence of Settlement Discussions. This case is dismissed in its entirety.

An appropriate Order accompanies this Memorandum Opinion.

Dated: August 12, 2016

                                                    /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge